IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 30, 2018 Session

## PREMIER IMAGING/MEDICAL SYSTEMS, INC. v. COFFEY FAMILY MEDICAL CLINIC, P.C.

Appeal from the Circuit Court for Scott County
No. 9058     John D. McAfee, Judge

No. E2017-02186-COA-R3-CV

This appeal arises from a breach of contract action. Premier Imaging/Medical Systems, Inc. ("Premier") contracted with Coffey Family Medical Clinic, P.C. ("CFMC"), an organization formed by Dr. D. Bruce Coffey, M.D. ("Dr. Coffey"), for a five year servicing contract ("the Contract") under which Premier would provide service for a CT Scanner ("the Scanner"). Pioneer Health Services of Oneida ("Pioneer") and Dr. Coffey later entered into an agreement whereby Pioneer assumed certain obligations, apparently including the Contract. At CFMC's request, Premier began billing Pioneer. Pioneer eventually stopped making payments under the Contract. Premier sued CFMC in the Circuit Court for Scott County ("the Trial Court") to recover on the remainder of the Contract. CFMC argued that Pioneer became a substituted obligor under a theory of novation. After trial, the Trial Court held that CFMC failed to prove novation, awarded Premier $89,166.60 for the twenty months remaining on the Contract, and granted prejudgment interest of ten percent from the end of the Contract for a total of $105,534.70. CFMC appeals. We hold, *inter alia*, that the Trial Court did not err in holding that CFMC was unable to meet its burden of proving that novation, implied or otherwise, occurred. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and JOHN W. MCCLARTY, JJ., joined.

Dudley W. Taylor, Knoxville, Tennessee, for the appellant, Coffey Family Medical Clinic, P.C.

John R. Cheadle, Jr. and Mary Barnard Cheadle, Nashville, Tennessee, for the appellee, Premier Imaging/Medical Systems, Inc.

# OPINION

## Background

The material facts of this case largely are undisputed. Dr. Coffey formed CFMC in 2003. Premier is in the business of servicing medical imaging equipment. In November 2010, the Contract was signed between CFMC and Premier. Premier was to service the Scanner used by CFMC for five years at a rate of $53,500.00 per year, payable at $4,458.33 per month. The effective date of the Contract was January 1, 2011. The Contract permitted customer cancellation "due to documented quality of service issues only."

In November 2013, Dr. Coffey and Pioneer executed a physician employment agreement, effective January 1, 2014. Dr. Coffey, in his capacity as landlord, and Pioneer as tenant also entered into a lease for real property dated December 12, 2013. As part of this agreement, Pioneer assumed certain contractual liabilities among which was the Contract. Premier was not a party to this particular agreement. Prior to January 2014, CFMC, or Dr. Coffey, paid on the Contract to Premier. CFMC requested that Premier begin billing Pioneer. Premier and Pioneer engaged in correspondence over the matter. Premier's President, Robin West ("West"), responded in part: "I assume when you purchased [CFMC] you assumed their liabilities" and "[w]e will send future invoices to [Pioneer] unless we can come to some kind of equitable agreement." In February 2014, Dr. Coffey, on CFMC letterhead, sent a letter to Premier purporting to cancel the Contract between CFMC and Premier. Premier and CFMC never executed a written document to modify the Contract. Pioneer made the monthly payments under the Contract only for the months of January, February, March and April 2014.

This arrangement quickly collapsed. In May 2014, CFMC sold the Scanner. In April 2015, Pioneer terminated both Dr. Coffey's employment agreement and the lease arrangement. Premier stopped getting paid on the Contract, and there no longer was a scanner to service. In January 2017, Premier sued CFMC in the Trial Court.

This matter was tried in November 2017. The principal testimony came from West, Premier's president. West testified, in part, as follows:

> Q. So would there have been anything for you to object to as far as Coffey Family Medical claiming that they are no longer on the hook for this contract and Pioneer should be?
> A. No. I never intended to let Coffey Medical off the hook.
> Q. But were they ever asking you to do that?
> A. No, they did not.

THE COURT: You were just told to bill them?
THE WITNESS: I was told to bill Pioneer by Coffey.
THE COURT: To send the bill to Pioneer?
THE WITNESS: Yes.
BY MS. CHEADLE:
Q. And you left Coffey Family Medical's name on each of those bills; is that correct?
A. Yes, I did.

***

Q. You say you never intended to let Coffey Family Medical off, but you never did tell them that, did you?
A. The contract was in place. I had no reason to tell them that.
Q. I understand, but when they asked you to now bill Pioneer, and Pioneer wrote you and said that we've taken over the practice, you didn't object to that, did you?
A. Didn't object to -- how can I object to them taking over the practice?
Q. Just answer the question. Then you can add whatever you want.
A. Ask the question in a way that I can answer it. I -- I'm -- I don't follow you.
Q. You never -- you sent the letter, we just talked about that, saying, Okay, I assume you took over. This can't be cancelled?
A. Right.
Q. So -- but -- so is there anything in writing that said, but we're keeping Coffey Family Medical on the hook?
A. Nothing other than the original contract, no.
Q. Okay. All right. And you never billed Coffey Family Medical Center again after these letters and you started your billing to Pioneer, did you?
A. No. I let my attorney handle that after that.
Q. Okay. What, in your opinion, was the CT machine worth at the time you did your last work?
A. You're asking me to be an appraiser, and I -- I hadn't seen the machine in probably two years prior to that.
Q. Okay.
A. I sent people in, you know.
Q. But you've got all this money in it, right? You put 100,000 in the machine in the tube or something like that, right?
A. Right.
Q. So you think it would be worth 3 or 400,000?

A. No.  The thing about medical equipment is, it depreciates very rapidly.  I mean, if you don't scan with it a lot and you don't get your money back off the patients, it's a losing proposition.  You never recover -- I mean, they depreciate so fast it would -- it would make -- make you sick if you were buying that as an investment.  It's not -- I mean, you have to get the money out of the patient.

Tony Taylor ("Taylor"), Pioneer CEO, testified as well.  Taylor testified to discussions with Premier regarding a possible transfer of the Contract rights and obligations to a CT machine in Aberdeen, Mississippi.  According to Taylor, the negotiations fell through because Premier insisted on a contract either for "three-year and it would have cost $345,000 or a five-year would have been a half a million dollars at 105,000 a year."

Following trial, the Trial Court found in favor of Premier and instructed Premier's counsel to prepare the order.  The Trial Court telephoned Premier's counsel directing the inclusion of certain findings of fact and conclusions of law, and faxed Premier's counsel these supplemental findings and conclusions.  The Trial Court subsequently informed CFMC's counsel as to what happened.  In December 2017, the Trial Court entered its final judgment.  The Trial Court found as follows:

> This cause came on to be heard on November 1, 2017, upon Premier Imaging / Medical Systems, Inc.'s ("Premier") suit to recover the balance due on a five (5) year Periodic Maintenance Contract/General Agreement upon which Premier was to provide periodic maintenance, service and parts for a "General Electric QX/I Lightspeed CT with H1 gantry", a CT scanner, owned by defendant, Coffey Family Medical Clinic, P.C. ("CFMC").  Prior to the hearing, the parties filed a joint stipulation of facts and documents that are not in dispute.  It is undisputed that Premier contracted with CFMC on January 1, 2011, for a five (5) year servicing contract for $53,500.00 per year, payable at $4,458.33 per month.  The parties agreed that the amount still owing on the contract is $89,166.60.  CFMC asserts that there [h]as been a novation and that a third party, Pioneer Health Services of Oneida ("Pioneer"), should be liable for the balance due.
>
> Robin West, Premier's president, testified that Premier utilizes three (3) or five (5) year contracts to spread the risk and costs associated with servicing and maintaining equipment.  CFMC elected to enter into a five (5) year contract with Premier.  Mr. West testified that Premier expended $400,000.00 to service and maintain CFMC's CT scanner.  Premier has only received $188,621.52 in payments.  Mr. West testified that Premier likely would not have renewed the contract with CFMC due to the fact that

-4-

Premier was not making a profit on the contract. It is undisputed that CFMC never notified Premier of any quality of service issues. Mr. West testified that in January 2014, Premier was notified by CFMC to begin billing a third party, Pioneer. Premier introduced invoices that were sent to Pioneer listing CFMC's name and address as the "Ship To" address. Mr. West testified that Pioneer attempted to cancel the underlying contract on behalf of CFMC through a letter dated January 17, 2014, from Pioneer's CEO, Tony Taylor. Premier first learned of Pioneer's arrangement with CFMC upon receipt of Mr. Taylor's January 17, 2014, letter. Premier introduced Mr. West's January 27, 2014, letter responding to Pioneer confirming that Premier had an active five (5) year service agreement with CFMC that could only be cancelled due to documented quality of service issues. Premier received four (4) payments from Pioneer for CFMC's monthly obligations for January 2014 to April 2014. Pioneer paid the January 2014 payment to Premier on April 30, 2014, the February 2014 payment to Premier on June 9, 2014, and the March and April 2014 payments to Premier on June 30, 2014. Each of the invoices that Pioneer paid listed CFMC as the ship to address. Mr. West testified that Premier never discharged, nor had the intent to discharge, CFMC from the original service contract of January 1, 2011. Mr. West testified that Premier never entered into, nor had the intent to enter into, a contract with Pioneer. Mr. West testified that twenty (20) months remained due on the underlying service contract.

Alan Ray Godfrey, service manager and engineer for Premier, testified for Premier. Mr. Godfrey testified that he routinely provided services to CFMC on Premier's behalf pursuant to the underlying contract. Mr. Godfrey testified that Premier had expended costs of $400,000.00 to service and maintain CFMC's CT scanner. Premier introduced Mr. Godfrey's work order for February 21, 2014, which details the services provided by Premier on CFMC's CT scanner. Mr. Godfrey testified that at the time of the February 21, 2014, service, CFMC's CT scanner was not being used by CFMC. Mr. Godfrey testified that when he attempted to schedule the next quarterly service with CFMC, Mr. Godfrey was informed by CFMC that the CT scanner had been sold. The last service that Premier was able to perform on CFMC's CT scanner was February 21, 2014, because CFMC sold its CT scanner on May 20, 2014.

Tony Taylor, prior CEO of Pioneer and administrator of the Scott County Hospital when Pioneer operated the hospital, testified pursuant to a subpoena from CFMC. Mr. Taylor testified that Pioneer entered into a physician employment agreement with Dr. Coffey, CFMC's principal, with an effective date of January 1, 2014, for a four (4) year term. Mr. Taylor

testified that Pioneer also entered into a lease agreement with Dr. Coffey to lease Dr. Coffey's real property in which he conducted CFMC's medical practice with an effective date of January 1, 2014, for a four (4) year term. Mr. Taylor testified that Pioneer, pursuant to the terms of the lease agreement, agreed to assume certain medical diagnostic leases, maintenance contracts, and other liabilities during the term of the lease, including the service contract that is the subject of this lawsuit. Mr. Taylor testified that Pioneer never intended to use CFMC's CT scanner. Mr. Taylor testified that Pioneer's intention was to have Dr. Coffey direct all patients to Pioneer's hospital for any needed CT scans. Mr. Taylor testified that Dr. Coffey was aware or should have been aware that Pioneer never intended to use CFMC's CT scanner, since Dr. Coffey was under a directive from Pioneer to begin referring any and all patients needing CT scans to Scott County Hospital. Mr. Taylor confirmed that Pioneer attempted to cancel the original service agreement between Premier and CFMC in a letter dated January 17, 2014, Mr. Taylor sent to Premier. In a follow-up letter from Premier to Pioneer dated January 27, 2014, Premier confirmed "an active service agreement" existing between Premier and CFMC.

Premier billed and accepted four payments (January-April 2014) from Pioneer. Pioneer paid the service payment for January 2014 on April 30, 2014; Pioneer paid the service payment for February 2014 on January 9, 2014; and Pioneer paid the service payments for March and April 2014 on June 30, 2014. The billing statements of January-April 2014 were also shipped to CFMC. Mr. Taylor testified that Pioneer made four (4) of the monthly payments on the underlying contract for the months of January 2014 to April 2014. Mr. Taylor testified that Pioneer never required CFMC to sell CFMC's CT scanner. Mr. Taylor testified that Pioneer terminated Dr. Coffey's employment on April 30, 2015. Mr. Taylor testified that Pioneer terminated the lease agreement for Dr. Coffey's medical practice office building on April 30, 2015. Mr. Taylor testified that Pioneer never intended to enter into a contract with Premier.

Charsley Coffey, CFMC's current office manager and Dr. Coffey's spouse, testified for CFMC. Ms. Coffey testified that CFMC sold the CT scanner on May 20, 2014, for $24,000.00. Ms. Coffey testified that none of the proceeds received from the sale of the CT scanner was paid to Premier.

The Court finds that there was not a novation. The burden of proof is on the party asserting novation. A novation is never presumed. It must be established by a clear and definite intention on the part of all concerned. CFMC failed to show clear evidence that there was a clear and definite intention on the part of all parties to extinguish the underlying contract and

to enter into a new contract. CFMC has failed to show that Premier discharged CFMC from its obligation. The totality of the facts and circumstances clearly do not show the assumption of such extinguishment and acceptance by Premier. Premier and Pioneer both confirm that neither had an intent to enter into a new contract. The Court finds that CFMC was not discharged from its obligation to Premier based upon the following facts: (1) Premier's invoices continued to list CFMC's name and address as the ship to location; (2) Robin West's letter of January 27, 2014, to Pioneer confirmed that Premier still had an active service agreement with CFMC; (3) Dr. Coffey's letter of February 7, 2014, to Premier attempting to cancel the contract confirms that CFMC was aware that CFMC was still responsible since CFMC was attempting to cancel the contract to which CFMC was a party, and CFMC acknowledges that CFMC was the originating party to the contact; (4) Mr. Taylor testified that CFMC was aware that there was never an intention by Pioneer to use CFMC's CT scanner after January 2014; and (5) Pioneer admits and confirms that it never intended to enter into a contract with Premier. Thus, CFMC failed to show clear evidence showing a total discharge of the original service contract and an express agreement by Premier to accept a new obligation in place of the old contract, or such facts and circumstances that clearly show the assumption of such extinguishment and acceptance by Premier. The underlying obligation was never extinguished, and CFMC's obligation to Premier remained in effect. The Court finds that CFMC is indebted to plaintiff on the servicing contract, and that judgment should enter in favor of Premier against CFMC.

The Court further finds that CFMC is indebted to Premier for pre-judgment interest at the rate of 10 percent per annum from December 31, 2015, to the date of trial. The Court finds that Dr. Coffey, CFMC's alter-ego and principal, knew that Pioneer never intended to use CFMC's CT scanner. Dr. Coffey had the obligation and responsibility to at least bring the parties together to work out the remaining twenty (20) months owed on the underlying service cont[r]act. At a minimum, Dr. Coffey had an obligation to renegotiate the lease agreement with Pioneer, aware that Pioneer would never use CFMC's CT scanner. The Court finds that CFMC sold the CT scanner and failed to pay any of the proceeds to Premier, when there was still an active servicing contract in effect.

It is, accordingly, ORDERED, ADJUDGED AND DECREED that defendant, Coffey Family Medical Clinic, P.C., pay to plaintiff, Premier Imaging / Medical Systems, Inc., the sum of $89,166.60, plus pre-judgment interest from December 31, 2015, to the date of trial in the amount of $16,368.10, for a total of $105,534.70; to accrue post-judgment interest at

the rate of 6.25 percent per annum, pursuant to T.C.A. § 47-14-121. The costs of this cause are assessed to CFMC; for all of the foregoing execution may issue. This is a final judgment, pursuant to Rule 54.02, Tennessee Rules of Civil Procedure, there being no just reason for delay.

CFMC timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, CFMC raises the following issues on appeal: 1) whether the Trial Court exercised its independent judgment in entering the final judgment drafted by prevailing counsel after engaging in ex parte communications with said counsel; 2) whether the Trial Court erred in declining to find novation between the parties when Premier, according to CFMC, accepted Pioneer as a substitute obligor and stopped billing CFMC; 3) whether the Trial Court erred in its measure of damages when no additional services were performed after February 2014; and 4) whether the Trial Court erred in awarding prejudgment interest when it failed to articulate its reasoning either for the award or the interest rate of 10%.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court exercised its independent judgment in entering the final judgment drafted by prevailing counsel after engaging in ex parte communications with said counsel as set out earlier in this Opinion. CFMC asserts, in a respectful fashion, that the final judgment reflects a cherry-picked version of the case favorable to Premier and not the Trial Court's own independent judgment. Regarding the necessity that judicial decisions be rendered independently, our Supreme Court has stated:

> The essential purposes of courts and judges are to afford litigants a public forum to air their disputes, and to adjudicate and resolve the disputes between the contending parties. To carry out these purposes, judges must arrive at their decisions by applying the relevant law to the facts of the case. Because making these decisions is a high judicial function, a court's decisions must be, and must appear to be, the result of the exercise of the trial court's own judgment.

*Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 312 (Tenn. 2014) (citations and quotation marks omitted).

The Trial Court declined to incorporate a transcript of its oral ruling into the final judgment. Normally, we would therefore confine ourselves to the Trial Court's written judgment in conducting appellate review. However, as CFMC questions the independence of the order itself, we deem it appropriate to examine the Trial Court's oral ruling to determine whether CFMC's argument is meritorious. The Trial Court articulated orally its rationale for deciding as it did as follows:

> THE COURT: All right. Well -- and again, the issue is novation, and I think counsel pointed out a significant portion of the letter dated 27, 2014, from Mr. West to Mr. Taylor where he clearly indicates that we have an agreement with CFMC for five years. And he makes that -- and again, novation is just simply the substitution of a new contract for an old one. The new contract extinguishes the rights and the obligations that were in effect under the old agreement. In a novation situation, the original debtor here, which would be CFMC, has to be totally, totally released from their obligation, which is transferred here in this case, it's argued, to Pioneer. All parties must agree to that. I can't find that in the record. I can't find that this was a total release. The argument that somehow or another Premier agreed to substitute or to relieve CFMC of their legal obligation under the Service Agreement by accepting payments from Pioneer somehow or another released CFMC, I cannot see that, nor can I agree to that. And therefore, the Court is finding, based upon the facts and circumstances and the totality of the case of the facts presented, that a novation does not exist in this case, and therefore, the original contract or the obligation between CFMC and Premier is still valid. And therefore, the Court's going to award the judgment for the plaintiff in this matter for the 20 months, which was the $89,166.60. Furthermore, the Court's going to award the prejudgment interest of 10 percent from the end of the contract for a number of reasons. Although it's discretionary for the Court, it's clear from the record that Dr. Coffey knew that the machine was never going to be used in January, and there should have been some obligation on his behalf. Whether that's warranted in cases, I don't know, but there should have been some obligation or responsibility on Dr. Coffey's part to at least bring these parties together and just say, Look, I'm no longer going to use this machine, and I still owe 20 months. And Pioneer, you and -- before I enter into this lease agreement with you, then you need to sit down with Premier and work this out, because I can't go -- you know, I'm hung on this

-9-

thing. I'm hung here for 20 more months, and if you all don't work this out, then we're going to have to renegotiate the lease agreement. I think Dr. Coffey had some obligation and responsibility in that context. And furthermore, he sold the machine for roughly about $24,000 and nothing was ever paid to Premier. And perhaps if that had been done, maybe I would have reconsidered the granting of the prejudgment interest in this case. But because of the machine being sold and because Dr. Coffey knowing fully and was apprised of the facts and circumstances of his obligation to Premier that he should have done something more in this matter in reference to Pioneer and Premier to try to have a binding novation concerning the parties in this matter. So that will be the order of the Court.

Party-prepared orders are permitted under two conditions: (1) "the findings and conclusions must accurately reflect the decision of the trial court" and "the record must not create doubt that the decision represents the trial court's own deliberations and decision." *Smith*, 439 S.W.3d at 316. An order prepared by counsel must reflect the trial court's own independent judgment as expressed by the trial court. The Trial Court made it abundantly clear, *inter alia*, that it found no novation, and why. In our view, the final judgment in this case reflects sufficiently the Trial Court's own independent judgment. We would, however, caution trial courts against ex parte communications, and this is so even when the trial court subsequently notifies the other side of the communication as happened here. We find no reversible error with respect to the entry of the final judgment.

We next address whether the Trial Court erred in declining to find novation between the parties when Premier, according to CFMC, accepted Pioneer as a substitute obligor and stopped billing CFMC. With respect to novation, this Court has discussed it as follows:

"A novation is a contract substituting a new obligation for an old one[,]" thereby extinguishing the existing contract. *Blaylock v. Stephens*, 258 S.W.2d 779, 781 (Tenn. Ct. App. 1953); *see also Pac. E. Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946, 958-59 (Tenn. Ct. App. 1995). The four essential elements of a novation are: "(1) a prior valid obligation, (2) an agreement supported by evidence of intention, (3) the extinguishment of the old contract, and (4) a valid new contract." *Brown v. Columbia Precast, LLC*, No. M2010-00971-COA-R3-CV, 2011 WL 2976891, at *7 (Tenn. Ct. App. July 21, 2011) (citing *Burchell Ins. Servs., Inc. v. W. Sizzlin Steakhouse of Dyersburg*, No. E2003-01001-COA-R3-CV, 2004 WL 1459398, at *3 (Tenn. Ct. App. June 29, 2004)). A novation is never presumed; rather, it must be established by a " 'clear and definite intention

-10-

on the part of all concerned....' " *Johnson City Elec. Supply Co., Inc. v. Elec. Inc.*, CA No. 81, 1986 WL 3885, at *3 (Tenn. Ct. App. Apr. 1, 1986) (quoting *Jetton v. Nichols*, 8 Tenn. App. 567, 574 (Tenn. Ct. App. 1928)). A novation need not be shown by express words, because the evidence supporting the parties' intent to agree on a novation "may be implied from the facts and circumstances attending the transaction and the parties' subsequent conduct." *Cumberland Cnty. Bank v. Eastman*, No. E2005-00220-COA-R3-CV, 2005 WL 2043518, at *4 (Tenn. Ct. App. Aug. 25, 2005) (citing *In re Edward M. Johnson & Assoc.*, 61 B.R. 801, 806 (Bankr. E.D. Tenn. 1986)). The party asserting the novation has the burden of proving a novation is intended. *Rhea v. Marko Constr. Co.*, 652 S.W.2d 332, 334 (Tenn. 1983).

*TWB Architects, Inc. v. Braxton, LLC*, No. M2013-02740-COA-R3-CV, 2014 WL 5502401, at *4 (Tenn. Ct. App. Oct. 30, 2014), *Rule 11 appl. perm. appeal denied Feb. 12, 2015*.

Premier states that it never intended to relieve CFMC under the Contract. In support of its contention, Premier notes the absence of a written agreement to that effect, as well as the "ship-to" locations identifying CFMC on invoices mailed to Pioneer. Furthermore, West testified that he never intended to let CFMC "off the hook." CFMC argues in response that novation was implicit in Premier's billing of Pioneer, and that Premier's actions at the time are more significant than their later denials.

CFMC is correct that novation need not be express. However, it is incumbent upon the proponent of novation to prove one occurred. The Trial Court found that "CFMC failed to show clear evidence that there was a clear and definite intention on the part of all parties to extinguish the underlying contract and to enter into a new contract." Based on this record, Premier accepted payments on the Contract from Pioneer simply because it wanted to continue being paid on the Contract, not because it intended to extinguish the underlying contract with CFMC. It made no difference to Premier whether the payments originated from CFMC or Pioneer. Premier never manifested an intention to extinguish the underlying contract with CFMC. While novation may be implied, it still requires "clear and definite intention" from all parties to extinguish the underlying contract. Additionally, the Trial Court found that Pioneer confirmed "that it never intended to enter into a contract with Premier." In this case, no such clear and definite intention was proven by CFMC. We affirm the Trial Court's decision that there was no novation.

We next address whether the Trial Court erred in its measure of damages when no additional services were performed after February 2014. CFMC acknowledges that 20

months remained on the Contract for a remaining balance of $89,166.60. However, CFMC argues that this figure is not the correct assessment of damages. CFMC argues that Premier being relieved of its obligation to service the Scanner actually was advantageous to Premier. Premier spent upwards of $400,000 servicing the Scanner. In CFMC's estimation, if history were any guide, CFMC may have spared itself a cost of some $200,000 by not servicing the Scanner for the remaining term of the Contract. CFMC argues also that Premier failed to mitigate its damages.

The purpose of assessing damages in a breach of contract case is to place the plaintiff, as nearly as possible, in the same position he would have been in had the contract been performed. *Adams TV of Memphis, Inc. v. Comcorp of Tennessee, Inc.*, 969 S.W.2d 917, 922 (Tenn. Ct. App. 1997); *Action Ads, Inc. v. William B. Tanner Co., Inc.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979). The injured party, however, is not to be put in a better position than he would have been in by recovery of damages for breach of the contract. *Adams TV*, 969 S.W.2d at 922.

CFMC recognizes in its appellate brief that whether Premier would have incurred costs going forward comparable to the ones it earlier had incurred is "unknown to all of us, including the trial court" and is only a "reasonable inference." This uncertainty contrasts with the stipulated and easily calculable balance owing under the plain terms of the Contract. Had CFMC continued to adhere to the Contract, it would have paid Premier $89,166.60. It is unduly speculative to guess what future costs Premier would have incurred in servicing the Scanner pursuant to the Contract, or indeed whether a hypothetical transfer may have mitigated Premier's losses. What we do know is that CFMC sold the Scanner midway through the term of the Contract and prevented Premier from performing its obligations under the Contract. The Contract allowed CFMC to cancel only for documented quality of service issues, which are not presented here. We find no reversible error in the Trial Court's award of damages to Premier of $89,166.60.

The final issue we address is whether the Trial Court erred in awarding prejudgment interest when it failed to articulate its reasoning either for the award or the interest rate of 10%. Regarding prejudgment interest, this Court has stated:

> "An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) (citing *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992)). The purpose of prejudgment interest "is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to

penalize a defendant for wrongdoing." *Myint*, 970 S.W.2d at 927. In Tennessee, several principles guide trial courts in exercising their discretion to award prejudgment interest. "Foremost are the principles of equity." *Id*.; Tenn. Code Ann. § 47-14-123. The trial court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. *Myint*, 970 S.W.2d at 927. Additionally, "[t]he certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest, is, as a matter of law, equitable under the circumstances." *Id*. at 928.

*SecurAmerica Business Credit v. Southland Transportation Co., LLC.*, No. W2015-00391-COA-R3-CV, 2016 WL 1292087, at *7 (Tenn. Ct. App. April 1, 2016), *no appl. perm. appeal filed*.

The range in which prejudgment interest may be set is addressed by statute as follows:

Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; provided, that with respect to contracts subject to § 47-14-103, the maximum effective rates of prejudgment interest so awarded shall be the same as set by that section for the particular category of transaction involved. In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47-14-103.

Tenn. Code Ann. § 47-14-123 (2013).

Premier initially sought $174,832.10 based on an erroneous recital in the Contract providing it ran from January 1, 2011 through December 31, 2016 for a six year term rather than a five year term as everyone agrees was the actual term. Premier later conceded that the correct figure is $89,166.60 for the 20 months remaining on the Contract. CFMC argues, among other things, that this uncertainty over the claim precludes an award of prejudgment interest and that the rate of 10% is excessive and unfounded.

In our view, any discrepancy appears to be one merely of tabulation rather than an inherent uncertainty over the claim. There is no dispute over what remains owing for 20 months under the Contract, even though CFMC disputes that as the proper calculation of

-13-

damages. In any event, as cited in the precedent above, certainty of a claim is but one nondispositive fact to consider when deciding whether to award prejudgment interest. The dispositive question is whether it is fair under the circumstances of the case.

The Trial Court found that CFMC "sold the CT scanner and failed to pay any of the proceeds to Premier, when there was still an active servicing contract in effect." CFMC, in selling the Scanner midway through the term of the Contract and effectively bolting on the Contract, pulled the rug out from underneath Premier. The Trial Court had a legitimate basis on which to conclude it is equitable that Premier should be compensated fully for loss of the use of funds to which it was entitled.

The rate of 10% chosen by the Trial Court is high indeed but within the law. We note that the Trial Court, to CFMC's benefit, ordered that the 10% interest did not start until the contract end date of December 31, 2015 rather than from the date each separate monthly payment was due. We are mindful that the decision to award prejudgment interest and at the rate it did subject to statutory limit was a discretionary matter for the Trial Court. We find no palpable or manifest abuse of discretion in the Trial Court's decision to award prejudgment interest at 10% to Premier. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Coffey Family Medical Clinic, P.C., and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-14-